# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40225**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Ryan M. PALIK**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 28 April 2023

————————————

*Military Judge:* Colin P. Eichenberger.

*Sentence:* Sentence adjudged on 13 August 2021 by GCM convened at Royal Air Force Mildenhall, United Kingdom. Sentence entered by military judge on 23 September 2021: Bad-conduct discharge, confinement for 10 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Matthew L. Blyth, USAF.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Major Deepa M. Patel, USAF; Major John P. Patera, USAF; Captain Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, CADOTTE, and ANNEXSTAD, *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Judge:

At a general court-martial, a panel of officer members convicted Appellant, contrary to his pleas, of two specifications of assault consummated by a battery and one specification of domestic violence in violation of Articles 128 and 128b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 928, 928b.[1] Consistent with his pleas, Appellant was found not guilty of 12 specifications of assault consummated by a battery, in violation of Article 128, UCMJ. A military judge sentenced Appellant to a bad-conduct discharge, confinement for ten months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raises six issues which we have reordered and reworded: (1) whether Appellant's convictions are factually sufficient; (2) whether Appellant's convictions are legally sufficient; (3) whether Appellant was denied the effective assistance of counsel under the Sixth Amendment[2]; (4) whether Appellant is entitled to a unanimous verdict under the Fifth[3] and Sixth Amendments; (5) whether trial counsel committed prosecutorial misconduct during sentencing argument; and (6) whether the record of trial is complete.[4]

We consolidate issues (1) and (2) since Appellant makes similar arguments. With respect to issues (4), (5), and (6), we have carefully considered Appellant's contentions and find they do not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant met SM in mid-2019 at work. Soon thereafter, the couple started dating. At the time of the offenses, Appellant and SM were involved in an intimate relationship. The offenses for which Appellant was convicted stem from two separate incidents. The first occurred on 3 July 2020, and the second took place on 20 August 2020.

### A. First Incident—3 July 2020

SM stayed at Appellant's apartment over the long weekend of the Fourth of July, 2020. On the night of 3 July 2020, the couple went to a nearby bar for

---

[1] All references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] U.S. CONST. amend. VI.

[3] U.S. CONST. amend. V.

[4] Issues (2), (5) and (6) were personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

drinks around 2000 hours. The couple began arguing at the bar and returned to the Appellant's apartment around 2230. At the apartment, the couple continued to argue. SM testified the argument eventually turned violent. As she explained, she remembered that at one point she got close to Appellant and was yelling at him because he was not listening to her. At this point, SM described, "[Appellant] put both hands on my neck and pushed me up against the wall and choked me." SM stated she was scared, could not breathe, and the strangulation lasted approximately five seconds. SM also testified that eventually they both calmed down and discussed the incident.

**B. Second Incident—20 August 2020**

The second incident occurred on the night of 20 August 2020. SM testified that on that night she and Appellant were drinking at a pub. After arriving back at Appellant's apartment, she fell asleep and woke up when Appellant poured water on her face and started screaming at her. SM explained Appellant was angry about some text messages he saw on her phone. SM stated when she asked Appellant for her phone back he threw her phone outside of the apartment window. She then stated she attempted to grab a second phone but Appellant got to it first and "broke it in half." After retrieving her phone, SM returned to the apartment. SM then described that Appellant pinned her down on the bed and strangled her with both hands for approximately five to eight seconds. She testified Appellant had his entire body on top of hers and that she could not move. She also stated that while this was happening, she was not able to breathe, her ears were ringing, her vision was going black, and she thought she was going to die. She stated that Appellant eventually let go of her neck, grabbed her by the hair and pulled her into a hallway leading to the living room.

SM testified that they continued to argue in the living room and that Appellant again pinned her legs down on the couch and strangled her with both hands on her neck. She testified that while this was happening she could not breathe or speak. However, she testified that she was able to move one of her arms and punched Appellant in his face twice with her fist, and that this caused Appellant to let her go. She stated that Appellant grabbed her by the hair again as she was trying to catch her breath, pulled her to the hallway, and eventually dragged her to the front door and threw her out of the apartment. SM described that she then reported the incident to her supervisor, who immediately reported the incident to security forces and the Air Force Office of Special Investigations (AFOSI). Later that night SM was interviewed by AFOSI agents, who took photographs of her injuries, which included bruising to her neck and the side of her face. The photographs also showed bruising on SM's lower back, both knees, and one of her ankles. She also had various scratches on her body.

A panel of officer members found Appellant guilty of assault consummated by a battery (Specification 1 of Charge II) for unlawfully touching SM's neck with force or violence on 3 July 2020.[5] The panel further found Appellant guilty of assault consummated by a battery (Specification 12 of Charge I) for unlawfully pulling SM by the hair with his hand in the direction of or through the front door of the apartment, and guilty of domestic violence on divers occasions (Specification 2 of Charge II) for unlawfully strangling SM with his hands, all during the 20 August 2020 incident.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant contends that the evidence is legally and factually insufficient to support the findings of guilty. Appellant argues now, as he did at trial, that he acted in self-defense on both occasions. Specifically Appellant argues that: (1) SM's accounts are not credible; (2) SM "admitted to being in his face, yelling at him, and pointing in his face[;]"and (3) "[g]iven that SM had already poked him in the face multiple times, his apprehension of further bodily harm was objectively reasonable." We are not persuaded by any of Appellant's contentions and find that no relief is warranted.

#### 1. Additional Background

At trial, Appellant testified that the couple had been arguing on 3 July 2020 and that the argument continued after they returned to the apartment from the bar. Appellant further testified SM was angry and was standing close to him, yelling in his face. He stated SM then poked Appellant in the face with her index finger, in which he immediately told SM to "back off." Appellant described SM then pushed him in the face with the palm of her hand. Appellant denied that he strangled SM, but did admit that he "pushed" SM, in the upper chest, to create some distance and told her to stop. Appellant stated that they eventually calmed down and discussed the incident.

Appellant also testified regarding the 20 August 2020 incident. He stated that on this night the couple had been drinking at a local pub. Appellant confirmed that SM had gone to bed. He explained that while SM was sleeping he found some text messages on her phone that he "didn't like" and that he angrily woke her up by pouring water on her face. He also confirmed that he threw SM's cell phone out the window, and he snapped a second phone in half.

---

[5] The members found Appellant not guilty of domestic violence, in violation of Article 128b, UCMJ, but guilty of the lesser included offense of assault consummated by a battery in violation of Article 128, UCMJ, in that Appellant did unlawful bodily harm to SM by touching her neck with force or violence.

Appellant explained that thereafter SM struck him in the face four or five times with a closed fist, and that he pushed her on the chest. He described that SM then began destroying things in the apartment, and that he wanted her out, so he "grabbed her shirt and pushed her towards the door." He further stated:

> Once we got close to the doorway for the kitchen, [SM] drops to her knees, just dead weight, just drops down and at that point I'm trying to grab – grab her to try to get her out and she is just [flailing] – she's flailing and swinging and I eventually ended up grabbing her hair and I tried to pull her towards the door but she grabbed the wall and I didn't – I was just trying to do it kind of get her to move that way but once she grabbed the wall I didn't want to actually hurt her so I let her [go].

Appellant later admitted that he grabbed her hair for about two seconds before letting her go in an attempt to get her out of the apartment.

### 2. Law

Issues of legal and factual sufficiency are reviewed de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "Our assessment of legal and factual sufficiency is limited to evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, 139 S. Ct. 1641 (2019). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v.*

*Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (internal quotation marks omitted) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to testify credibly. *See United States v. Rodriguez-Rivera,* 63 M.J. 372, 383 (C.A.A.F. 2006) (explaining testimony of a single witness may satisfy the Government's burden to prove every element of a charged offense beyond a reasonable doubt).

To find Appellant guilty of assault consummated by a battery, in violation of Article 128, UCMJ, the members were required to find the following three elements beyond a reasonable doubt: (1) that Appellant did bodily harm to SM; (2) that the bodily harm was done unlawfully; and (3) that the bodily harm was done with force or violence. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 77.b.(2).

To find Appellant guilty of domestic violence, in violation of Article 128b, UCMJ, the members were required to find the following two elements beyond a reasonable doubt: (1) that Appellant assaulted SM by strangling her with his hands; and (2) that at the time SM was an intimate partner of Appellant. *See* 10 U.S.C. § 928b(5); *see also MCM*, App. 2, at A2-46.

Self-defense is an affirmative defense to a charge of assault consummated by a battery, *see generally* Rule for Courts-Martial (R.C.M.) 916(e) and Discussion, and has three elements. First, the accused must have had a reasonable apprehension that physical harm was about to be inflicted on him; second, the accused must have believed that the amount of force he used was required for protection against bodily harm; and third, the force used by the accused must have been "less than force reasonably likely to produce death or grievous bodily harm." R.C.M. 916(e)(3)(A)–(B). The right to self-defense is lost "if the accused was an aggressor, engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred." R.C.M. 916(e)(4). However, an accused who starts an affray is entitled

to use reasonable force in self-defense to defend against an opponent who escalates the level of the conflict. *United States v. Dearing*, 63 M.J. 478, 484 n.24 (C.A.A.F. 2006) (citations omitted).

Accident is also an affirmative defense to assault consummated by a battery, *see generally* R.C.M. 916(f) and Discussion,[6] and has three elements. First, there must be evidence "that [an appellant] was engaged in an act not prohibited by law, regulation, or order;" second, the lawful act must be shown to "have been performed in a lawful manner, i.e., with due care and without simple negligence; and" third, it must be shown that "this act was done without any unlawful intent." *United States v. Arnold*, 40 M.J. 744, 745–46 (A.F.C.M.R. 1994) (citing *United States v. Van Syoc*, 36 M.J. 461, 464 (C.M.A. 1993)); *see also* R.C.M. 916(f) ("A death, injury, or other event which occurs as the unintentional and unexpected result of doing a lawful act in a lawful manner is an accident and excusable.").

If raised by the evidence, the prosecution has the burden of proving beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1).

### 3. Analysis

Our review of the record finds that the Government introduced convincing evidence for a rational factfinder to find beyond a reasonable doubt Appellant guilty of assaulting his intimate partner, SM, on both 3 July 2020 and 20 August 2020.

Most significant was the testimony of SM who described in detail the violent assaults that took place in Appellant's apartment. She testified that on 3 July 2020, Appellant strangled her with both hands for five seconds, during which time she could not breathe. Additionally, she described how on 20 August 2020 Appellant strangled her on two occasions: one where she was not able to breathe, her ears were ringing, her vision was going black and that she thought she was going to die; the other ending only when she punched Appellant twice with a closed fist. She also described with clarity how Appellant grabbed her by the hair and pulled her around the apartment, eventually pulling her through the door and out of the apartment. If believed, SM's testimony clearly establishes each element of the offenses of which Appellant was convicted. Although we recognize our authority to find the victim not credible based simply on a cold reading of the record, the members were in a better position to make that assessment. *Washington*, 57 M.J. at 399.

---

[6] *See also United States v. Curry*, 38 M.J. 77, 80 (C.A.A.F. 1993) ("Accident, while loosely called an 'affirmative defense,' is more accurately a 'substantive law defense which negatives guilt by cancelling out' one or more *mens rea* components." (Citation omitted).).

That stated, our review also finds that a rational factfinder could have determined that SM's testimony was supported by the initial statements she provided to her supervisor following the 20 August 2020 incident, and later to AFOSI agents during the investigation. A rational factfinder also could have found that SM's testimony was supported by the photographs taken of her injuries after reporting the second incident. These photographs depict injuries to her face, neck, lower back, knees, and legs that are consistent with her initial report, and her testimony at trial concerning the assaults.

From their findings, it appears that the members weighed witness credibility in their consideration of all the evidence, followed the military judge's instructions, and took measures to ensure they determined Appellant's guilt based only on the evidence that was presented at trial. They found Appellant not guilty of 12 other specifications involving SM and another named victim; and found Appellant guilty of one specification (Specification 2 of Charge II), used exceptions and substitutions on another specification (Specification 12 of Charge I), and convicted Appellant of a lesser-included offense of another specification (Specification 1 of Charge II). All of these points indicate that SM's credibility was, in fact, a strong consideration for the members during the court-martial.

When viewing the evidence offered at trial, in the light most favorable to the Government, a rational factfinder could readily find the essential elements of offenses for which Appellant was convicted—and the absence of affirmative defenses—beyond a reasonable doubt. We therefore conclude the evidence is legally sufficient to support Appellant's convictions. *See Robinson*, 77 M.J. at 297−98.

We have also reviewed the evidence, paying particular attention to the inconsistencies and argument concerning the applicable defenses that were raised by the evidence at trial and again by Appellant on appeal. We note that the photographs taken following the 20 August 2020 incident support SM's and not Appellant's versions of events on that night. None of the arguments raised concerning SM's credibility or the minor inconsistencies that were highlighted at trial cause us to believe that SM's testimony regarding the convicted offenses was not credible. Giving the appropriate deference to the trial court's ability to see and hear the witnesses, and after our own independent review of the record, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41.

## B. Claim of Ineffective Assistance of Counsel

Appellant contends he received ineffective assistance from his trial defense counsel. Specifically, Appellant asserts his counsel were deficient in that they failed to file a motion under R.C.M. 914 for production of SM's recorded

statements to AFOSI. We disagree with Appellant's contention that he received ineffective assistance of counsel and find no relief is warranted.

**1. Additional Background**

On 20 and 21 August 2020, SM was interviewed by AFOSI agents. Although the agents who conducted the interview believed the interviews were recorded, the video recordings were ultimately "lost." At trial, Special Agent (SA) HO testified, "[T]hose interviews were deleted off the system. There's an unknown reason. However, they were deleted before we were able to put them on a CD." SA HO realized that the recordings were missing on 26 October 2020.

On 19 November 2020, AFOSI notified the base legal office about the missing videos. On 23 July 2021, assistant trial counsel informed Appellant's trial defense counsel that "any [AF]OSI recorded interview of [SM] was lost and that no member of the legal office has previously reviewed any [AF]OSI recorded interview of [SM]."

After SM testified at Appellant's court-martial on behalf of the Government, trial defense counsel did not make a motion under R.C.M. 914 asking the military judge to order the Government to produce the allegedly video-recorded statements SM made to AFOSI, or request any remedy based on the Government's inability to produce such statements.

On 6 December 2022, we ordered Appellant's trial defense counsel, Major (Maj) AN, Captain (Capt) OH, and Capt RH, to provide responsive declarations to address Appellant's ineffective assistance of counsel claim.[7] We have also considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and his trial defense team's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay,* 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam). We find a hearing unnecessary to resolve Appellant's claims.

In her declaration to this court, Appellant's circuit trial defense counsel, Maj AN, stated that she did "not have actual knowledge as to whether [SM's interviews] were ever recorded." She further explained:

> In this case, the Defense has no knowledge as to whether [AF]OSI's recording device was fully functional or definitely captured the two interviews [AF]OSI conducted of [SM] on 20 August and 21 August 202[0]. To the Defense's knowledge, no [AF]OSI agent, trial counsel, or member of the legal office has

---

[7] Because the issue was raised in the record but was not fully resolvable by those materials, we may consider the declarations submitted by trial defense counsel consistent with *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

viewed any recording of the two [AF]OSI interviews at issue, nor have they confirmed their existence at any point.

In their declarations, both Maj AN and Capt OH explained that did not think a motion under R.C.M. 914 would prove successful without knowing whether the interviews ever existed in the first place. Maj AN then discussed the rationale for not pursuing video-recorded interviews:

> The Defense considered pursuing the two [AF]OSI video recorded interviews further but held concern over the potential for its use by the [G]overnment as prior consistent statements in the event they ever existed and could be produced. Defense counsel recognized the likelihood that [SM] would appear distraught, disheveled, or injured in any video recording given her immediate reporting of the assault. I did not continue to pursue the status of the [AF]OSI video recorded interviews because I did not want to give trial counsel the ability to use a video recording for prior consistent statements with a potentially sympathetic victim visually depicted in the video. I had concerns that any recorded [AF]OSI interview of [SM] would be more beneficial to the prosecution than to the defense. It is not unheard of for [AF]OSI to later supplement a case file with additional evidence and I was not confident that would not occur in this case because this [AF]OSI detachment has previously investigated a separate case in which several discs of video surveillance not originally associated with its case file were later found on the eve of trial. The Defense's preference was to cross-examine [SM] with the version of events she reported to . . . [AF]OSI based on their notes, as well as [Appellant]'s version of events, and highlight that [AF]OSI did not have the video recordings in an effort to discredit the investigation.

**2. Law**

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are the appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id*. (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on an appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). An appellant overcomes the presumption of competence only when he shows there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Datavs*, 71 M.J. at 424 (additional citations omitted). In reviewing the decisions and actions of trial defense counsel, this court ordinarily does not second guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)). For this reason, defense counsel receive wide latitude in making tactical decisions. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Strickland*, 466 U.S. at 689). This also applies to trial defense counsel's strategic decisions. *Morgan*, 37 M.J. at 410. "[S]trategic choices made by trial defense counsel are virtually unchallengeable after thorough investigation of the law and the facts relevant to the plausible options." *Akbar*, 74 M.J. at 371 (internal quotation marks and citation omitted).

In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

### 3. Analysis

We find that Appellant has failed to meet his burden to demonstrate deficient performance by his trial defense counsel. Applying the *Polk* factors to the present case, it is uncontroverted that trial defense counsel did not file a motion under R.C.M. 914 for production of SM's video-recorded statements to AFOSI. That said, we find that Appellant's trial defense counsel have articulated a reasonable rationale for not doing so—they could not confirm that the video recordings in question ever existed, and feared they might exist. We also find that it was reasonable for Appellant's defense counsel to question whether the video recorded interviews existed because the videos had never been viewed by AFOSI agents or any member of the prosecution team.

Trial defense counsel have further articulated that they strategically chose not to press the Government to either search for the videos or produce the videos because they did not think it would be helpful to Appellant's defense. On this point, we find it reasonable for Maj AN to conclude that she "did not want to give trial counsel the ability to use a video recording for prior consistent statements with a potentially sympathetic victim visually depicted in the video." Further, she feared the "likelihood that [SM] would appear distraught, disheveled, or injured in any video recording given her immediate reporting of the assault" would garner sympathy from the members. Finally, she explained her strategy was to "highlight that [AF]OSI did not have the video recordings in an effort to discredit the investigation." We do not find these strategic decisions by Appellant's trial defense counsel unreasonable or based on inadequate investigation. We recognize that another trial defense counsel may have chosen a different strategy, including filing a motion under R.C.M. 914, but we do not find Appellant's trial defense counsel's strategy to be "outside the wide range of professional assistance that constitutes effective assistance of counsel." *Lilly v. Gilmore,* 988 F.2d 783, 788 (7th Cir. 1993).

In conclusion, after applying the established framework to address claims of ineffective assistance of counsel, we conclude that Appellant has not overcome the presumption of competence and has failed to demonstrate either deficient performance, or that his trial defense counsel's performance was "measurably below the performance . . . [ordinarily expected] of fallible lawyers." *See Polk*, 32 M.J. at 153. We therefore find no relief is warranted.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.[8]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[8] Appellant raises in a footnote to his brief that the entry of judgment (EoJ) is inaccurate and requires correction. Specifically, Appellant contends that the EoJ incorrectly states that the adjudged sentence concerning "Forfeitures of Pay and/or Allowances" was incorrectly recorded as "Total Forfeitures" where the military judge sentenced him "To forfeit all pay and allowances." Appellant requests that we remand his case for a corrected EoJ. We decline Appellant's request; the EoJ recorded Appellant's sentence to "Total Forfeitures" which we interpret in this case means forfeiture of all pay and allowances absent evidence to the contrary.