# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 12, 2012        Decided July 23, 2013

No. 12-5038

EARLE ARTHUR PARTINGTON,
APPELLANT

v.

JAMES W. HOUCK, VICE ADMIRAL, JAGC, USN, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01962)

*Earle Arthur Partington*, pro se, argued the cause for appellant. On the briefs were *Charles W. Gittins* and *Jeffrey A. Denner*.

*Arthur B. Spitzer* and *Daniel M. Gluck* were on the brief for *amici curiae* American Civil Liberties Union of the Nation's Capital, et al. in support of appellant.

*Marina Utgoff Braswell*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Attorney Earle Partington brought this action against the Judge Advocate General of the Navy and other naval officials, alleging violation of his constitutional rights in an administrative decision which suspended him from practice before naval courts. His action purported to set forth four causes of action. The district court entered summary judgment in favor of the defendant as to part of the action and dismissed the rest. *Partington v. Houck*, 840 F. Supp. 2d 236 (D.D.C. 2012). Partington seeks review, alleging various errors in the grant of the judgments against him. We conclude that the district court committed no reversible error, and for the reasons set forth more fully below, affirm.

## I. BACKGROUND

A. The Underlying Events

Appellant Partington is an experienced practicing lawyer and retired member of the Army Judge Advocate Generals Corps, who, as a part of his practice, has engaged in the representation of military personnel before military courts, including those of the Navy. In May 2006, he represented Stewart Toles, an Aviation Structural Mechanic with the United States Navy, in a General Court-Martial at Pearl Harbor. Toles faced four charges, including sexual harassment and video voyeurism, stemming from his frequent, covert recordings of females in various states of undress, and other similar misconduct on or near a Navy base in Hawaii. Pursuant to a pretrial agreement with the prosecution, Toles entered guilty

pleas to two of the charges and their specifications and to all but two specifications under the video voyeurism charge, while pleading not guilty to one charge. Under the applicable military court procedure, a military judge conducted a providence inquiry. The providence inquiry is a more elaborate relative of the Rule 11 proceeding under the Federal Rules of Criminal Procedure. In the conduct of such an inquiry, the military judge has a duty to ensure that a plea is voluntary and that there is a factual basis for the plea. *See* Rules for Courts-Martial 910(d),(e); *United States v. Hartman*, 69 M.J. 467, 468 (CAAF 2011). Before taking Toles's pleas, the military judge had asked counsel to raise any motions before the entry of the plea. Nonetheless, Partington waited until virtually the end of the providence inquiry—after the military judge had found that Toles "knowingly, intelligently, consciously waived [his] rights against self incrimination," and his rights to trial and confrontation—to make a motion to dismiss. That motion, which concededly was well taken, was based on a jurisdictional defect in the charges of video voyeurism, in that the charges and specifications did not allege that the offenses took place within the "special maritime and territorial jurisdiction" of the United States, an element of the crime defined under 18 U.S.C. § 1801. While it is undisputed that Partington's motion on behalf of Toles was well taken, it is equally undisputed that Partington was aware of the defect before the entry of the plea and the providence inquiry.

Unsurprisingly, some confusion ensued. The military judge set aside Toles's guilty pleas and the pretrial agreement, finding that Toles could not have given a provident plea while knowing he would challenge the sufficiency of the video voyeurism specifications. After the military judge entered his ruling, trial counsel for the prosecution agreed that if Toles was willing to enter a guilty plea to a lesser included offense and be bound by the earlier pretrial agreement, the government would also agree

to adhere to the pretrial agreement and withdraw some of the other charges, including video voyeurism. The military judge then accepted the plea. Thereafter, Toles was sentenced to a bad conduct discharge and five years confinement. Toles retained Partington to represent him during the automatic appeal of the courts martial conviction. *See* 10 U.S.C. § 866(b)(1).

In his appellate brief for Toles, Partington made assertions that the military judge had "acquitted" appellant on some of the offenses and had "dismissed" some specifications—representations which the Navy-Marine Corps Court of Criminal Appeals (NMCCA) found to be misleading and not consistent with the record. Indeed, the appellate court described various arguments proffered by Partington in his brief to be "disingenuous," clear misrepresentations of the record, and "wholly unsupport[able]" by the record. The court described itself as specifically "troubled by . . . appellant's wholly unsupported allegations of error . . . ." These allegations, raised by Partington in the Toles brief, included that the military judge "dismissed" the video voyeurism specifications under charges 1 and 4; that the military judge "acquitted" appellant as to those offenses; that the judge "ruled" that the video voyeurism specifications did not allege that offense; and, that the appellant "moved for neither an acquittal nor a dismissal of those specifications." All these arguments the appellate court described as disingenuous. So disturbed was the court that it ordered a copy of its opinion to be forwarded to the "Judge Advocate General of the Navy and the Navy's Rules Counsel for review and action as appropriate." The clerk of court of the NMCCA forwarded the court's opinion as a professional responsibility complaint against Partington.

B. The Navy JAG Disciplinary Proceedings

In October of 2008, the Office of the Rules Counsel of the Navy Judge Advocate General Corps notified Partington that it had received the opinion of the NMCCA as a complaint against Partington in his capacity as defense counsel in the Toles case. It further notified him that the Rules Counsel was conducting an inquiry to determine whether he had violated rules of professional responsibility, particularly Rules 3.1 through 3.3. The notice invited Partington to "provide written comment on the issues raised" by the complaint, and advised him that his written comment must be provided within ten working days of the receipt of the letter from the Rules Counsel. By letter of October 26, 2008, Partington made responsive comments. On June 18, 2009, the Rules Counsel appointed Captain Robert Porzeinski, a Navy JAG officer, to conduct a preliminary inquiry into the allegations of professional responsibility violations against Partington. On June 29, Captain Porzeinski informed Partington of his investigation and afforded him an opportunity to submit any written statement or other written material he wished Porzeinski to consider. Partington's response to the letter offered nothing substantive, but requested a "charge sheet."

Captain Porzeinski forwarded his report to the Rules Counsel on July 16, 2009, concluding that, based on a preponderance of the evidence, Partington had violated Rules 3.1 and 3.3 of the Navy's Rules of Professional Responsibility.[1]

---

[1]Those Rules provide:

RULE 3.1 MERITORIOUS CLAIMS AND CONTENTIONS. A covered attorney shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which

includes a good faith argument for an extension, modification, or reversal of existing law. A covered attorney representing an accused in a criminal proceeding or the respondent in an administrative proceeding that could result in incarceration, discharge from the naval service, or other adverse personnel action, may nevertheless defend the client at the proceeding as to require that every element of the case is established.

RULE 3.3 CANDOR AND OBLIGATIONS TOWARD THE TRIBUNAL

a. A covered attorney shall not knowingly:

(1) make a false statement of material fact or law to a tribunal;

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the covered attorney to be directly adverse to the position of the client and not disclosed by opposing counsel;

(4) offer evidence that the covered attorney knows to be false. If a covered attorney has offered material evidence and comes to know of its falsity, the covered attorney shall take reasonable remedial measures; or

(5) disobey an order imposed by a tribunal unless done openly before the tribunal in a good faith assertion that no valid order should exist.

b. The duties stated in paragraph a continue to the conclusion of the proceedings, and apply even if compliance requires disclosure of information otherwise protected by

After further correspondence between Porzeinski and Partington, Porzeinski sent the Rules Counsel two supplements to his July 16 report affirming his earlier recommendation to open an ethics investigation against Partington. The Rules Counsel subsequently appointed Captain Robert Blazewick, a Navy JAG officer, to conduct an ethics investigation of Partington, and informed Partington of the investigation.

In October and November of 2009, Captain Blazewick sent Partington multiple letters in which he attempted to set a hearing and included a charge sheet with specifications for Partington's alleged violations of Rules 3.1 and 3.3. In December 2009, Captain Blazewick sent Partington a letter stating that he had substantially completed the ethics investigation. The letter also set a hearing date. Partington responded by letter that he did not see the point in attending a hearing if the Navy did not intend to provide him basic due process. Although Captain Blazewick held a hearing, Partington did not appear.

On February 19, 2010, Blazewick submitted an ethics investigation report to the Rules Counsel in which he opined that Partington had violated Rules 3.1 and 3.3, and recommended Partington's indefinite suspension. A summary of the investigation of Partington was forwarded to Vice Admiral

---

Rule 1.6.

> c. A covered attorney may refuse to offer evidence that the covered attorney reasonably believes is false.

> d. In an ex parte proceeding, a covered attorney shall inform the tribunal of all material facts known to the covered attorney which are necessary to enable the tribunal to make an informed decision, whether or not the facts are adverse.

James W. Houck, Judge Advocate General of the Navy. In May of 2010, Admiral Houck notified Partington by certified mail of his conclusion that Partington had intentionally misrepresented the posture of the Toles case on appeal. Admiral Houck's notice went on to explain that although the military judge at Toles's court martial had said he was entering a "finding" of not guilty, the military judge had clearly misspoken in the context of the proceedings, and Partington grossly exaggerated the import of those statements on appeal. The letter informed Partington that he was indefinitely suspended from practicing law before the Navy. The Navy also notified other jurisdictions of its suspension of Partington, leading to disciplinary measures before the Court of Appeals for the Armed Forces and at least one state jurisdiction where Partington was licensed.

## II.  ANALYSIS

We review summary judgments *de novo* and consider evidence in the light most favorable to the non-moving party. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013). In reviewing a district court's ruling on summary judgment, we have discretion to uphold its judgment under a different legal theory than that applied by the trial court, as long as the record supports our reason for affirmance and we "avoid denying the opposing party a fair opportunity to dispute the facts material to the new theory." *United States v. General Motors Corp.*, 518 F.2d 420, 441 (D.C. Cir. 1975) (internal quotation marks omitted).

A. The Navy Judge Advocate General's Authority to Discipline Partington

Partington contends that the Judge Advocate of the Navy had no statutory authority to impose discipline upon civilian defense attorneys appearing at naval courts-martial, and that

therefore, the entire proceedings against him and the action taken are void. The district court rejected this contention and held that the Judge Advocate General had authority to discipline Partington based on the Uniform Code of Military Justice and the Manual for Courts-Martial. We agree. The Uniform Code of Military Justice, Article 36, authorizes the President to prescribe "[p]retrial, trial, and post-trial procedures" for cases arising under the Uniform Code of Military Justice "triable in courts-martial." 10 U.S.C. § 836(a). Under that authority, the President prescribed the Manual for Courts-Martial by Executive Order. *See* Prescribing the Manual for Courts-Martial, United States, 1951, 16 Fed. Reg. 1,303 (Feb. 10, 1951). The Manual for Courts-Martial includes the Rules for Courts-Martial. *See* M.C.M. at II-1 (2012).

Rule 109(a) of the Rules for Courts-Martial states that each Judge Advocate General "is responsible for the professional supervision and discipline of . . . judge advocates, and other lawyers who practice in proceedings governed by the [Uniform Code of Military Justice] and [the Manual for Courts-Martial]." Each Judge Advocate General may prescribe rules of professional conduct, and those rules may include sanctions for violating the rules, including indefinite suspension. R.C.M. 109(a). Acting within the authority granted by R.C.M. 109(a), the Judge Advocate General promulgated an Instruction on "Professional Conduct of Attorneys Practicing Under the Cognizance and Supervision of the Judge Advocate General." *See* JAGINST 5803.1C (Nov. 9, 2004); 32 C.F.R. Part 776. This instruction includes within the definition of "covered attorneys" "[a]ll civil service and contracted civilian attorneys who practice law or perform legal services under the cognizance and supervision of the JAG." JAGINST 5803.1C ¶ 4(c); 32 C.F.R. § 776.2(b)(iii).

Under a plain reading of R.C.M. 109(a)'s phrase, "other lawyers who practice in proceedings governed by the [Uniform Code of Military Justice] and [the Manual for Courts-Martial]," "other lawyers" includes civilian attorneys who defend military servicemen tried in courts-martial. Thus, R.C.M. 109(a) delegates to each Judge Advocate General the professional supervision and discipline of military and civilian attorneys who represent clients in courts-martial, rendering JAGINST 5803.1C's definition of "covered attorneys" a valid exercise of the Navy Judge Advocate General's delegated authority.

Partington, disputing the natural reading of R.C.M. 109(a), maintains that the term "other lawyers" in R.C.M. 109(a) refers to non-JAG active duty attorneys. Appellant Br. at 30. He also contends the President does not have authority under Article 36 of the Uniform Code of Military Justice to prescribe rules governing civilian attorneys, claiming that Congress's delegation of rule-making authority to the President in Article 36 of the Uniform Code of Military Justice "can only relate to areas of *court-martial procedure*, not to matters of substantive law." *Id.* at 27 (citing *Ellis v. Jacob*, 26 M.J. 90, 92–93) (C.M.A. 1988)).

We do not find Partington's arguments persuasive. He cites no case supporting his cramped interpretation of R.C.M. 109(a), but instead argues that "when Congress grants executive officials the authority to discipline civilian attorneys, it does so *expressly*, not *sub silentio*." Appellant Br. at 22, 31. In support of this statement, he cites two statutes in which Congress expressly gave agencies the authority to discipline attorneys who appear before them. *See id.* at 22–24 (citing 35 U.S.C. § 32 (authorizing the Patent and Trademark Office to discipline attorneys appearing before it); 31 U.S.C. § 330 (authorizing the Department of Treasury to discipline attorneys appearing before it)). We are not convinced. The fact that Congress has

expressly given authority to other agencies to discipline attorneys does not prove that an agency may only have that authority by way of an explicit statutory provision. To the contrary, Congress gave the President broad authority to prescribe court-martial procedures in the Uniform Code of Military Justice, *see* 10 U.S.C. § 836, and his delegation of professional supervision over all lawyers who practice before court-martial proceedings does not contravene any cited statutory provision of the Uniform Code of Military Justice.

Partington's related argument—that the President's delegated rule-making authority "can only relate to areas of *court-martial procedure*, not to matters of substantive law," Appellant Br. at 27—assumes that the JAG's rules of professional conduct and disciplinary procedures are matters of substantive law and not, as the phrase "Complaint Processing Procedure" implies, procedures. *See* JAGINST 5803.1C, Enclosure (2) (Nov. 9, 2004). But Partington provides no authority to support this assumption, and the cases he cites are not on point. Each case explains that the President may not prescribe binding rules in areas of substantive *criminal* law, such as the definition of "distribute" in a narcotics case, *United States v. Omick*, 30 M.J. 1122, 1124 (N.M.C.M.R. 1989), the rules for proving or rebutting a defendant's intent when it is an element of a crime, *Ellis v. Jacob*, 26 M.J. 90, 91–93 (C.M.A. 1988), or whether a conspirator may be held liable for overt acts that occurred before joining a conspiracy. *United States v. Johnson*, 25 M.J. 878, 884 (N.M.C.M.R. 1988). Because the disciplinary procedure is an area of court-martial procedure, Partington's argument that the President did not have authority to delegate responsibility for professional supervision to the Judge Advocate General is incorrect. Accordingly, we conclude that

the district court did not err in holding that the Navy Judge Advocate General had authority to discipline Partington.[2]

### B.  Fifth Amendment Claim

Partington next contends that the proceedings against him conducted by the Judge Advocate Generals Corps did not afford him due process in violation of his rights under the Fifth Amendment.  The district court dismissed Partington's Fifth Amendment claim on the rationale that Partington had "not identified an actionable liberty or property interest in the practice of law before naval courts." *Partington v. Houck*, 840 F. Supp. 2d at 242 (D.D.C. 2012).  On appeal, Partington and amici ACLU argue that the district court erred in determining that Partington had no protectable property interest.  *See* Appellant Br. at 32–34; Amici Br. at 4–11.  They rely on numerous cases that have recognized a property interest in an attorney's license to practice law that cannot be taken away "in a manner or for reasons that contravene the Due Process" protection of the Constitution. *See, e.g.*, *Willner v. Committee on Character and Fitness*, 373 U.S. 96, 102–03 (1963). Appellees argue, as the district court held, that the cases relied upon by appellant and amici are inapposite, as the Navy JAG "neither suspended nor revoked Partington's license to practice law."  Appellees Br. at 24.  This may constitute a distinction without a difference.  The revocation of an attorney's license might often affect only his privilege to practice before the courts of the licensor, and to recognize the distinction  argued by the appellees might create an exception to a recognized property interest which would substantially devour the recognized

---

[2]In concluding that the NJAG had authority to discipline Partington, we note that Partington's argument to the contrary is particularly specious in light of the consent form he signed, in which he agreed to abide by the Navy's rules and regulations for court-martial proceedings.

interest. Nonetheless, we reach the same conclusion as the district court, albeit for a different reason. Assuming that Partington did have a protectable property interest in practicing before the naval courts, the district court nonetheless correctly entered judgment against him on his Fifth Amendment claim because the Judge Advocate General provided Partington ample due process before imposing discipline upon him.

Due process at its core requires notice and hearing. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). In attorney disbarment proceedings the Supreme Court has explained that "'notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defence.'" *In re Ruffalo*, 390 U.S. 544, 550 (1968) (quoting *Randall v. Brigham*, 74 U.S. 523, 540 (1868)). Thus, in determining whether the JAG afforded Partington due process in his disciplinary proceedings, we review the record to determine whether Partington received notice and an opportunity to be heard. The record is replete with communications between the JAG and Partington in which the JAG gave Partington notice it was pursuing an ethics investigation against him and gave Partington opportunity to be heard, beginning with the Rules Counsel's letter to Partington in October 2008. This letter explained that the Rules Counsel viewed the NMCCA opinion as a complaint, and that an inquiry would be conducted to determine whether there was probable cause to believe that Partington had violated any rules of professional responsibility, "in particular, Rules 3.1 through 3.3." Joint Appendix 275. In that letter, the Rules Counsel also explained that "you may provide written comment on the issues raised" by NMCCA opinion. *Id.*

After the Rules Counsel appointed Captain Porzeinski to conduct a preliminary investigation, Captain Porzeinski informed Partington of the preliminary investigation, explaining in a June 2009 letter that "[t]he purpose of this letter is to afford you an opportunity, as required by [JAGINST 5803.1C], to review all evidence that I consider in my inquiry and provide you a reasonable period of time to submit a written statement or other written material that you would like me to consider." *Id.* 317. Captain Porzeinski, in a July 2009 letter responding to statements Partington had written, again gave Partington the opportunity to submit "any written statement or other written material that you would like me to consider." *Id.* 336–37.

On October 22, 2009, after Captain Porzeinski had submitted his preliminary investigation report to the Rules Counsel, the Rules Counsel again wrote to Partington, explaining that the preliminary investigation had determined, by a preponderance of the evidence, that violations of the Rules of Professional Conduct had occurred, and that Captain Blazewick had been appointed to conduct the ethics investigation. Enclosed with that letter were a list of professional conduct violations Partington was alleged to have committed, and the preliminary inquiry prepared by Captain Porzeinski, which exhaustively reviewed the trial court record and compared it to the statements Partington made on appeal, and which reviewed Partington's correspondence after the Rules Counsel received the complaint. *See id.* 310–35. The Rules Counsel's October 2009 letter also explained the ethics investigation procedure and informed Partington of his rights, including the right to elect a hearing. On October 22, 2009, Captain Blazewick also sent Partington a letter informing him of his rights and attempting to set a date for a hearing, and a week later sent another letter giving Partington additional time to schedule a hearing and a list of the specific rules Partington was alleged to have violated, with supporting factual allegations. After a few months'

additional correspondence, Partington wrote to Captain Morin that he was refusing to attend the hearing, alleging that the JAG had been consistently depriving him of due process and explaining that he had "no intention in participating in this blatant violation of the Sixth Amendment right to counsel." *Id.* 405. Shortly after this correspondence, Captain Blazewick completed his ethics investigation. Based on that ethics investigation the Judge Advocate General decided to indefinitely suspend Partington.

In reviewing this exhaustive record, it is clear to us that Partington received ample due process. He was informed numerous times of the specific violations of the NJAG's Rules of Professional Conduct alleged against him and was provided with several opportunities to respond, including an opportunity for a hearing that he effectively waived. It is therefore apparent that Partington was not deprived of the fundamental due process rights of notice and hearing under *Mathews v. Eldridge*.

Partington attempts to buttress his claim of deprivation of due process by a scattershot, twelve-point attack, which he asserts demonstrates that he was "clearly denied procedural due process in the NJAG proceeding." Appellant Br. at 34. None of the points reflect a deprivation of due process. Some are conclusory allegations that the Navy "made no effort to follow its own regulations." Some deal with substantive decisions of the Navy. Some are trivial and contrived.

The fall of Partington's general argument of due process deprivation takes with it his assertion of a claim for constitutional tort under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). His whole *Bivens* claim is based on the due process arguments which we have already rejected.

C.  APA Claim

Partington also asserts a claim for review under the Administrative Procedure Act.  In this claim he asserts that "the decision of the NJAG was arbitrary, capricious, and based upon improper interpretation of the pertinent facts and legal standards."  Joint Appendix 37.  The district court dismissed Partington's claim under the APA because it determined that neither the NJAG nor the Court of Appeals for the Armed Forces was an "agency" within the meaning of the APA.  *See Partington*, 840 F. Supp. 2d at 244.  Although the district court correctly held that the Court of Appeals for the Armed Forces is not an agency, *see Shaw v. United States*, 209 F.2d 811, 813 (D.C. Cir. 1954), we hold that its determination that the NJAG's indefinite suspension of Partington was not agency action was erroneous.

Under the APA, an "agency" "means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include . . . the courts of the United States [or] . . . courts martial and military commissions." 5 U.S.C. §§ 551, 701.  Although "[t]he statutory definition of 'agency' is not entirely clear, . . . the APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971).

In concluding that the NJAG was not an agency, the district court relied on another district court case, *McKinney v. Caldera*, 141 F. Supp. 2d 25 (D.D.C. 2001), *aff'd sub nom.*, *McKinney v. White*, 291 F.3d 851 (D.C. Cir. 2002), in which the district court held that the Judge Advocate General of the Army was not an agency.  *See Partington*, 840 F. Supp. 2d at 243. In *McKinney*, the plaintiff, a Sergeant Major of the Army, was tried in court-

martial and filed various post-trial petitions alleging prosecutorial misconduct. *McKinney*, 141 F. Supp. 2d at 26. The Judge Advocate General, after ordering an investigation into the allegations and reviewing the record, denied the plaintiff's petitions without providing any reasoning for his decision. *Id.* at 28–29. The *McKinney* district court, after reviewing the case law on the definition of "agency" and the Judge Advocate General's relationship to other components of the army, concluded that it was not clear whether the Judge Advocate General was vested with substantial independent authority. *Id.* at 34.

On appeal, we did not discuss whether the Judge Advocate General is an agency, instead addressing the threshold issue of whether we could review Judge Advocate General decisions reviewing courts-martial in light of the APA's express exclusion of "courts martial and military commissions" from its definition of "agency." *McKinney*, 291 F.3d at 853. Ultimately, we determined that Congress's decision to establish a separate judicial system for courts-martial review, of which the Judge Advocate General's "final and conclusive" review was a part, together with the exclusion of courts martial from the APA's definition of "agency," precluded APA review of the Judge Advocate General's decision. *Id.* at 854–56.

This case is factually distinct from *McKinney*, where the plaintiff sought to have us review a decision by the Judge Advocate General made pursuant to his review under Article 69 of the UCMJ of a court martial decision. *See* 10 U.S.C. § 869. In contrast to *McKinney*, the disciplining of Partington did not involve any aspect of the criminal justice procedure established by the UCMJ, but was instead an ethics investigation undertaken pursuant to the Judge Advocate General's responsibility for the professional supervision of attorneys. *See* R.C.M. 109(a).

Although the NJAG's authority to discipline attorneys may derive from the UCMJ, *see* 10 U.S.C. § 836, Partington's proceedings are not part of the "separate justice system" Congress provided for in the UCMJ for military personnel, and Partington's APA claim is not "an attempt to end run a military justice system" in which Congress established procedures for review. *McKinney*, 291 F.3d at 855–56. Instead, Partington's disciplinary proceeding is peripheral to the adjudication of criminal liability in the military justice system, and pertains solely to the Judge Advocate General's responsibility to ensure attorneys act ethically and to maintain the integrity of the courts-martial. This case is more similar to *Piersall v. Winter*, 435 F.3d 319 (D.C. Cir. 2006), in which we explained that decisions rendered by the Board for Correction of Naval Records, "a civilian administrative board established by the Congress separate and apart from the system of military courts," were reviewable under the APA because such review did not breach the statutory prohibition which controlled in *McKinney*. *Id.* at 324. Just so here. The Judge Advocate General's Office, when it is operating outside the statutory exclusion for courts-martial, fits comfortably within the statutory definition of agency stated above. Accordingly, we conclude that the Judge Advocate General took agency action in the disciplinary proceedings against Partington and that the decision in those proceedings is subject to review under the APA. Notwithstanding our conclusion that the district court erred in the ground upon which it dismissed Partington's APA claim, we will nonetheless affirm the judgment on a different ground, that is, that the Judge Advocate General's decision was not arbitrary or capricious.

Partington asserts that the Judge Advocate General's decision violated the APA because: (a) JAGINST 5803.1C does not establish a standard of proof; and (b) the record was insufficient to support the Judge Advocate General's findings

that Partington misrepresented the trial court proceedings on appeal before the NMCCA. We disagree with both assertions.

First, JAGINST 5803.1C does establish standards of proof. Under JAGINST 5803.1C's Complaint Processing Procedure, "The [Preliminary Inquiry Officer] shall personally review the results of the preliminary inquiry to determine whether, by a preponderance of the evidence, a violation of the Rules or the Code of Judicial Conduct has occurred." JAGINST 5803.1C, Enclosure (2), at 8. This procedure also directs the Judge Advocate General, when receiving an ethics investigation, to either: (1) direct further inquiry; (2) determine that the allegations are unfounded or no further actions warranted; or (3) determine that the allegations are supported by clear and convincing evidence, and take appropriate action. JAGINST 5803.1C, Enclosure (2), at 13–14. Thus, Partington's assertion that the JAGINST did not establish standards of proof is incorrect.

Second, we conclude that the Judge Advocate General's decision that Partington misrepresented the military judge's statements in his appellate brief was not arbitrary or capricious, and was supported by substantial evidence. *See* 5 U.S.C. § 706. Indeed, the Judge Advocate General's ultimate decision came after a preliminary inquiry and ethics investigation, both of which extensively cited the record of trial and compared it to the statements in Partington's appellate brief to support their respective author's conclusions that Partington had made misstatements on appeal. *See* Joint Appendix 283–314, 319–35. These investigations reasonably determined that the military judge, in the context of the proceedings, did not "acquit" Toles or dismiss the charges against him, *see id.* 309–10, 331–33, and that Toles had moved to dismiss, in contradiction to Partington's statement before the NMCCA that "Toles had moved for neither

an acquittal nor a dismissal of these specifications." *See id.* 310, 331.

In reviewing Partington's APA claim, we note that we do not substitute our judgment for that of the agency or evaluate *de novo* whether Partington misrepresented the plea proceedings, but instead determine "whether the agency's decisionmaking was reasoned." *National Treasury Employees Union v. Helfer*, 53 F.3d 1289, 1292 (D.C. Cir. 1995); *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43 (1983).

We conclude that the NJAG, in explaining that he found that Partington filed an appellate brief containing statements Partington knew were false and misleading, *see* Joint Appendix 434–35, articulated a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Because the record does not support Partington's APA claim, we affirm the district court's judgment dismissing that claim.

## CONCLUSION

For the foregoing reasons, we affirm the district court's order entering judgment in favor of the defendants. Because we affirm the dismissal of all claims alleged by Partington, we also deny Partington's request for mandamus review.

*So ordered.*